**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

      vs.                                      Case No. 24-CR-1026 KWR

DAMIAN AMARILLO,

      Defendant.

**<u>DEFENDANT DAMIAN AMARILLO'S SENTENCING MEMORANDUM</u>**

Defendant Damian Amarillo, by and through undersigned counsel, Jon Stanford and Joel Meyers, respectfully submits this Sentencing Memorandum in advance of the sentencing hearing scheduled for June 16, 2026. There are no unresolved objections to the Presentence Investigation Report ("PSR"). Mr. Amarillo respectfully requests that the Court impose a sentence at the low end of the agreed-upon range of 120 months of imprisonment pursuant to the parties' Rule 11(c)(1)(C) plea agreement. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I.      BACKGROUND

On March 17, 2026, Damian Amarillo entered a guilty plea to a one count Information charging Second Degree Murder; Crime in Indian Country, in violation of 18 U.S.C. §§ 1111 and 1153. The offense arose from events occurring on June 5, 2024, within the boundaries of the Jicarilla Apache Indian Reservation, Rio Arriba County, New Mexico. Pursuant to a plea agreement created under Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agreed that a sentence within the range of 10 to 16 years (120 to 192 months) constitutes the appropriate

disposition of this case. Mr. Amarillo has been in continuous custody since his arrest on June 5, 2024, now approximately 24 months.

The death of John Doe is a tragedy that has surely caused profound grief to Mr. Doe's family, and Mr. Amarillo recognizes that harm. Mr. Amarillo acknowledges his responsibility for that death and carries its weight. At the same time, the § 3553(a) factors, most notably Mr. Amarillo's age, total absence of prior criminal history, acceptance of responsibility, and the terrible circumstances of his upbringing, strongly support a sentence at the low end of the agreed-upon range.

## II.    ARGUMENT

### A.    Mr. Amarillo's Youth, Background, and Lack of Criminal History Support a Low-End Sentence

Damian Amarillo was nineteen years old at the time of this offense. He is now twenty-one. The United States Supreme Court has recognized, in a series of landmark decisions, that youth is a constitutionally and penologically significant mitigating factor.  In *Eddings v. Oklahoma,* 455 U.S. 104 (1982), the Supreme Court recognized that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage." *Id.* at 115. Similarly, in *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court found that "[t]he susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.'" *Id.* at 570 (quoting *Thompson v. Oklahoma*, 487 U.S. 815 (1988)). *Roper* also reasoned that because juveniles have lessened culpability due to their age, they are less deserving of the most severe punishments. *See, generally, Id.* at 571.  *See also Miller v. Alabama*, 567 U.S. 460 (2012)("the distinctive attributes of youth diminish the penological justifications for

imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.")(internal citation omitted).

The reasoning of the Supreme Court in these cases rests on neurological and developmental science. Adolescent and young adult brains remain in active development through the mid-twenties, with the prefrontal cortex, the region governing impulse control, risk assessment, and long-range planning, among the last to mature. Courts around the country have recognized the relevance of this science to young adult sentencing under § 3553(a). *Eddings* held: "[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered (in assessing his culpability)." 455 U.S. at 116. This applies with particularity to Mr. Amarillo, who was 19 on the date of incident, and grew up in an environment where drugs, alcohol, incarceration, and the chaos of frequently moving between residences of different caregivers was routine for him. see, e.g., PSR ¶¶ 61-70. The full impact of being raised in such an environment is difficult to comprehend.

Mr. Amarillo had no prior criminal history prior to the instant offense. His criminal history score is zero, placing him in Criminal History Category I. The PSR describes this offense as "a deviation by the defendant from an otherwise law-abiding life." PSR ¶ 92. That observation carries significant weight and bears re-reading. A young person who has never before run afoul of the law presents a very different risk profile from a recidivist offender. His lack of any prior record, combined with his youth at the time of the offense, supports a strong inference of rehabilitative potential that weighs in favor of the minimum agreed sentence.

Moreover, Mr. Amarillo grew up under deeply adverse circumstances that were not of his making. He was raised in a chaotic household characterized by frequent moves, chronic

substance abuse, absent parenting, and regular violence. PSR ¶¶ 62–63. He reports that he raised himself from a young age, often caring for his younger brother while his mother and others "partied." PSR ¶ 63. He was subjected to physical punishment with belts and cords, experienced food insecurity, and lived intermittently with relatives because his home environment was so persistently unstable. PSR ¶¶ 62–64. Police presence was common at his house. PSR ¶ 63. His most reliable caregiver, his maternal grandmother, died in 2019, when he was fourteen years old. PSR ¶ 62. Child protective services became involved with his family when he was approximately ten years old. *Id.*

The Supreme Court has long recognized that a defendant's traumatic childhood is a legitimate mitigating factor under § 3553(a)(1). In *Penry* v. *Lynaugh,* 492 U.S. 302, 319 (1989), the court found that "[e]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse'")(internal citation omitted). *Penry* also recognized the principle that "punishment should be directly related to the personal culpability of the criminal defendant." *Id.* Accordingly, in *Wiggins v. Smith,* 539 U.S. 510 (2003), the Court found that defendant Wiggins' childhood involving deprivation of necessities, physical abuse, housing instability, and the general chaos of being raised by an alcoholic parent formed "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability. *Id.* at 535. The *Wiggins* Court recognized that childhood exposure to neglect, substance abuse, and violence increases the risk of poor decision-making in adolescence and young adulthood, not because such individuals are beyond redemption, but because they lacked the stable developmental environment necessary to build the emotional regulation skills that most take for granted. Data has shown that

"[m]isconduct (both property crimes and crimes against persons) peaks between age 16 and 21 but then sharply self-desists with the developmental confluence of neurodevelopment and social maturation."[1]  More recently, scientists have found that "most late adolescents change their behavior, including through neurological growth that enhances their capacity for reasoned decision-making under stress and future-looking orientation, and are uniquely amenable to rehabilitation."[2]

Mr. Amarillo is an example of exactly what the Court in *Penry* and *Wiggins* was concerned with. Mr. Amarillo grew up with housing instability from an early age.  He was physically and emotionally abused and experienced food insecurity, all while having to be the caregiver for his younger siblings. He was exposed to "people drinking, using drugs, destroyed items and random people partying [at his mother's house]" and frequent presence of child protective services and the police at his mother's residence.  PSR ¶¶ 62–63.  It is not surprising that Mr. Amarillo finds himself in the criminal justice system after growing up in such an environment of lawlessness and chaos.  Perhaps the only unexpected aspect to it is that Mr. Amarillo does not have any prior arrests.  Frankly, he didn't stand much of a chance.

Although the law considers Mr. Amarillo to be an adult, scientists have determined that he is still an adolescent.[3]  Scientists and courts have learned that "the adolescent brain is still developing, that it is highly subject to reward and peer-influence, and that its rate of

---

[1] Center For Law, Brain, & Behavior, "Juvenile Justice and the Adolescent Brain,";
https://clbb.mgh.harvard.edu/juvenilejustice/

[2] Ashley Nellis, Ph.D, Niki Monazzam: *Left to Die in Prison:Emerging Adults 25 and Younger Sentenced to Life without Parole,* The Sentencing Project (June 2023).

[3] See, generally, Sawyer SM, Azzopardi PS, Wickremarathne D, Patton GC. The age of adolescence. Lancet Child Adolesc Health. 2018 Mar;2(3):223-228. doi: 10.1016/S2352-4642(18)30022-1. Epub 2018 Jan 30. PMID: 30169257. ("Rather than age 10-19 years, a definition of 10-24 years corresponds more closely to adolescent growth and popular understandings of this life phase…")

development varies widely across the population."[4]  This important discovery has changed how the law treats youths who get into trouble. Youths are more likely to make impulsive decisions without thinking about the consequences.  Youths are also more easily influenced by peer pressure and oftentimes don't have control over their environment, e.g., the ability to truly choose their own peer group or to manage the situations they sometimes find themselves in. Researchers seeking to understand the differences in the adolescent brain regarding impulse control and decision making have found "a growing national understanding that young adults need to be treated differently in the criminal legal system because their brains are still developing…"[5]  Such advances in understanding the neurological differences in the still-developing brains of youths is confirming what parents have always learned via real world observation and empirical data: young people act without thinking. The Supreme Court recognizes that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham v. Florida,* 560 U.S. 48, 68 (2010).  In *Roper,* the Supreme Court found that "[a]s compared to adults, juveniles had a 'lack of maturity and an underdeveloped sense of responsibility'" and that they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure."  543 U.S. at 569-570 (internal citation omitted).

New Mexico courts agree. In *Ira v. Janecka,* 2018-NMSC-027, 419 P.3d 161, the New Mexico Supreme Court recognized the advancements in neuroscientific studies of adolescent behavior which support a growing trend in the opinion that juvenile culpability for criminal

---

[4] Center For Law, Brain, & Behavior, "Juvenile Justice and the Adolescent Brain,";
https://clbb.mgh.harvard.edu/juvenilejustice/[4]
[5] ACLU of Washington, "The Connection Between Brain Science and Sentencing Reform,"
January 5, 2024; https://www.aclu-wa.org/story/connection-between-brain-science-and-sentencing-reform

behavior is "mitigated by adolescence and immaturity," and that "a juvenile is more likely to be rehabilitated than an adult and therefore should receive a meaningful opportunity to obtain release by demonstrating maturity and rehabilitation." *Id.,* at 1. This approach, focused on understanding *why* youths commit crimes, rather than simply punishing the crime in a binary way, promotes a public policy of actual rehabilitation and the belief that even youths who have made serious mistakes still deserve a chance for redemption without an overly-long term of incarceration.

Mr. Amarillo's youth and his background of deprivation and abuse do not excuse his behavior. But that doesn't mean those attributes should be ignored, either. Mr. Amarillo's youth and upbringing provide a psychological and biological explanation of how a young man with no prior criminal history could make such reckless decisions which led to a catastrophic result. It is untenable to presume that Mr. Amarillo's actions were the product of reason and calculation, rather than the impulsivity and thoughtlessness which are an unsurprising outcome from being raised in an environment of chaos and suffering.

**B.    Mr. Amarillo Has Genuinely Accepted Responsibility for His Actions.**

Mr. Amarillo entered a timely plea of guilty to the Information, accepting full legal and moral responsibility for his role in the death of John Doe. He received the maximum acceptance of responsibility reduction under USSG §§ 3E1.1(a) and (b), a total of three levels, because he both clearly demonstrated acceptance and timely notified the government of his intention to plead guilty. PSR ¶¶ 50–51.

In letters written while in custody at the Jicarilla Apache Department of Corrections, before legal proceedings had fully unfolded, Mr. Amarillo referenced his mental health and expressed the weight of what had occurred. His writings are inconsistent and scattershot. PSR ¶

28. He acknowledged to his family that he was grappling with his actions and expressed remorse. The calls, statements, and letters referenced in the PSR at paragraphs 26-29 sound like what they are: the panicked reaction of a young man in a dysregulated mental and emotional state. Nearly two years later, Mr. Amarillo has already shown signs of maturation. While Mr. Amarillo's conduct related to the charges in this case reflects the poor judgment of someone who acted without regard for anyone else, his ultimate decision to accept responsibility for what he did through a guilty plea reflects a measure of growth.

Acceptance of responsibility is meaningful precisely because it is not legally compelled. By pleading guilty, Mr. Amarillo spared the victim's family, witnesses, and the Court the burden of a trial. He saved judicial and prosecutorial resources. And he made the difficult personal choice to stand before this Court and own what he did, rather than challenge the government on its proof. Acceptance of responsibility is no small thing, and it matters in fashioning an appropriate sentence.

## C.    A Ten-Year Sentence Serves the Purposes of 18 U.S.C. § 3553(a).

Under 18 U.S.C. § 3553(a), Courts are directed to impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a)(2).

A sentence of 120 months accomplishes each of these goals. The offense is serious, a human life was lost, and John Doe's daughters will carry that loss forever. No result can balance those scales or assuage the grief the John Doe's family has experienced. But decade of imprisonment reflects that gravity, especially when that decade is also roughly half the time Mr.

Amarillo has been alive. Additionally, decades of criminological research confirm that the marginal deterrent effect of very long sentences over moderately long sentences is minimal, while the cost in human capital, particularly for a young, first time offender with genuine rehabilitative potential, is enormous.[6] Mr. Amarillo has distinguished himself by earning a position of trust as a porter at the Cibola County Correctional Center. PSR ¶ 72. He expressed a desire to continue his education and pursue training in automotive mechanics or electronics. PSR ¶ 71. He has maintained consistent contact with his family and his relationship with Genesis Cassador has remained supportive throughout his incarceration. PSR ¶ 67.

After serving 120 months, Mr. Amarillo will be released at approximately age thirty-one, with the opportunity to become a productive member of society. The Court will also impose a term of supervised release of up to five years, providing additional oversight and accountability. PSR ¶ 79. Mr. Amarillo also requests that he be permitted to participate in the Residential Drug and Alcohol Treatment Program (RDAP) while incarcerated.  These combined measures are sufficient to serve the purposes of § 3553(a) without imposing a term greater than necessary.

### III. CONCLUSION

Damian Amarillo respectfully requests that this Court impose a sentence of 120 months of imprisonment, the low end of the parties' agreed-upon range under Rule 11(c)(1)(C). This sentence is sufficient, but not greater than necessary, to satisfy the purposes of 18 U.S.C. § 3553(a), and it appropriately reflects Mr. Amarillo's youth, his total lack of prior criminal history, the profound disadvantages of his upbringing, and his genuine acceptance of responsibility for his actions.

---

[6] https://counciloncj.org/wp-content/uploads/2024/05/Impact-of-Long-Sentences-on-Public-Safety.pdf

Respectfully submitted,

/s/ Jon K. Stanford
Jon K. Stanford
Stanford Law Office
317 Commercial St. NW, Suite 200
Albuquerque, NM 87102
jon@stanfordlawoffice.com
(505) 977-6538
Counsel for Defendant Damian Amarillo


/s/ Joel R. Meyers
Joel R. Meyers
1000 Cordova Place, Suite 930
Santa Fe, NM 87505
(505) 847-7757
jrm@jrmeyerslaw.com
Counsel for Defendant Damian Amarillo


## CERTIFICATE OF SERVICE

I hereby certify that on June 7th, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the United States.


/s/ Jon K. Stanford
Jon K. Stanford